**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff*,<br>v.<br>SAMAJ COLLINS,<br>*Defendant*. | Crim No. 24-782 (KSH)<br><br>**OPINION** |

**Katharine S. Hayden, U.S.D.J.**

## I. Introduction

This matter comes before the Court on defendant Samaj Collins's motion to suppress the drugs seized from his person during a police operation that took place on September 6, 2023. After reviewing the parties' submissions on the motion (D.E. 39, 42, 43), the Court set an evidentiary hearing, at which the government called the arresting officer, Lucas Borges. Afterwards, the parties submitted additional post-hearing briefing. (D.E. 48, 49.) Along with the parties' briefs, the record consists of Borges's testimony, video-cam recording of the stop of the car Collins was riding in and the interaction of the police and the individuals in the car, which includes footage of Borges's recovery of the drugs from Collins's pants pocket, and live-feed from an Instagram account that alerted police to criminal activity in that car and led to the stop and ultimate arrests.

## II. Findings of Fact

Lucas Borges has been a patrol officer for the Newark Police Department since 2022 and has participated in approximately 200 arrests. (D.E. 47, Transcript of Lucas Borges ("Borges Tr.") 6:12-15, 7:11-8:6.) He testified that on September 6, 2023, Newark police officers were

monitoring the Instagram account of Fakhir Johnson ("Johnson") when it went live. (*Id.* 9:12-14, 10:11-12:19.) Officers recorded the live video in two screen recordings, which were admitted and played at the evidentiary hearing. (*Id.* 13:9-18.) In the first video, Johnson is seen in a car "flashing a gun" at the camera and at Collins. (*Id.* 10:14-15, 11:10-13:2; D.E. 42 & Ex. C, USA_COLLINS_61 at 1:22 to 1:27.) In the second video, Johnson is seen holding a gun in his lap with an extended magazine. (Borges Tr. 32:19-25, 44:3-13; D.E. 42 & Ex. C, USA_COLLINS_62 at 0:03 to 0:05.) Borges testified that the first gun did not have the high-capacity magazine and the other gun did, suggesting two different guns were in the car. (Borges Tr. 44:25-45:9.)

Using FaceTime, the officers monitoring Johnson's Instagram account that afternoon alerted Borges, who was patrolling in a marked police car. (*Id.* 10:11-25, 14:10-15:2, 16:10-15.) They had located what they believed was the car with the individuals and guns inside at 16 Vailsburg Terrace and they wanted Borges to serve as backup. (*Id.* 14:25-15:8.) This was for safety reasons, since "[a]pproaching a vehicle with a marked patrol unit is way better than approaching a vehicle with an unmarked vehicle." (*Id.* 14:10-22.) When he arrived at the location, Borges stopped his car next to the target parked car and activated his body-worn camera. (*Id.* 15:6-20.)

Collins and another individual were sitting in the back of the parked car. (*Id.* 16:16-22.) Borges ordered them out. (*Id.* 15:7-8.) He told Collins to face the car and place his hands on the roof. (*Id.* 16:18-22.) Collins was wearing loose gray fleece gym shorts over compression shorts with a wide waist band. (*Id.* 33:1-6.) Borges patted Collins down for weapons "because we [had been] watching the live and then we saw the weapon. We [were] looking for a weapon." (*Id.* 16:23-17:1, 33:20-34:1.) He noted that that Collins's pockets were protruding out, so he could

tell something was inside them. (*Id.* 34:19-35:8, 39:14-18.) During the evidentiary hearing, the government played the body-worn camera footage and showed the pat-down frame-by-frame and Borges clarified that, although the footage does not show the angle "very well," he patted-down "the outside [of Collins's shorts] with both hands at the same time." (*Id.* 17:1-20:1, 34:13-18.)

As Borges "was frisking the outside of" Collins's shorts, he "felt the bag of the envelope and the rubber band," and that's when he "knew it was drugs." (*Id.* 17:2-5, 48:12-19; *see* D.E. 42 & Ex. B, ("BWC Footage") at 14:47:36 to 14:47:37.) He testified:

> I felt it, the amount of drugs he had on his pocket it was a good amount. I felt the rubber band too on the packet. That is when I knew there was drugs. And then I pull it out and then place it on top of the vehicle.
>
> [(Borges Tr. 17:2-5, 19:7-12, 20:7-12.)]

Borges testified that "[b]y the experience you gain on the streets of Newark, we basically deal with narcotics every day." (*Id.* 8:15-9:8.) He stated that he is familiar with narcotics packaging and how that packaging typically feels during a pat-down, including that glassine envelopes are used to pack the drugs in and rubber bands are usually used to "maintain[] [the envelopes] together so they don't come out." (*Id.* 8:15-9:8, 38:7-10, 39:7-10, 48:20-49:4.) After Borges felt the packaging and quantity of drugs in Collins's pockets, he pulled them out. (*Id.* 38:2-10, 39:22-40:6.) Borges seized 100 glassine envelopes of heroin and 41 jugs of crack cocaine. (*Id.* 52:5-16.)

Upon seizing the drugs, Borges arrested Collins, took him over to his police car and placed him inside. (*Id.* 21:20-21.) While he had been engaged with Collins, other officers on the scene were dealing with the driver and another occupant of the car and a full search was going on of the car itself to locate the gun or guns visible in the Instagram live feed. (*Id.* 45:13-46:9; D.E. 42, BWC Footage at 14:49:59 to 14:54:20.) Borges helped with the search, which was coming

up empty. (D.E. 42, BWC Footage at 14:49:59 to 14:54:20.) The officers can be overheard on Borges's body-worn camera footage speculating that a gun had to be in the car, since they had searched the other passengers and recovered only one gun. (*Id.* 14:49:31 to 14:49:40 (Johnson "had a gun" on him), *id.* 14:51:55 to 14:52:37 (officer asking another passenger if he has a gun on him), *id.* 14:53:42 to 14:54:20 ("It's gotta be in there."), *id.* 14:55:02 to 14:55:22 ("Where's the other gun at?").)

At some point, another officer brought Collins out of the police car to re-frisk him. (*Id.* 14:55:51 to 14:55:52.) Soon after, that officer stated, "we got it," finding the second gun tucked in Collins's underwear. (*Id.* 14:55:52 to 14:55:59, 14:56:29.) Borges testified that he missed the gun, admitting that "we wouldn't be here today" if he had properly patted down Collins's groin area. (*Id.* 34:5-9, 22:18-23:5, 46:14-21.)

On September 11, 2023, Collins was charged in a criminal complaint with possession with intent to distribute controlled substances and possession of a firearm during and in relation to a drug trafficking crime. (D.E. 1.) Bail was denied after a bail hearing held on October 13, 2023. (D.E. 18, 19.) On December 2, 2024, a grand jury returned a two-count indictment against Collins charging the same crimes, possession with intent to distribute and possession of a firearm in furtherance. (D.E. 33.) On February 27, 2025, Collins filed the instant motion to suppress. (D.E. 39.)

## III. Law

In *Terry v. Ohio*, the Supreme Court held that an on-the-street warrantless search is reasonable under the Fourth Amendment where certain conditions are met. 392 U.S. 1 (1968). That is,

> where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the

> persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, **he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him**.

*Id.* at 30 (emphasis added).

Another exception to the Fourth Amendment's warrant requirement is the "plain feel" doctrine, recognized in *Minnesota v. Dickerson*, 508 U.S. 366 (1993). There, the Supreme Court considered "whether police officers may seize nonthreatening contraband detected during a protective patdown search of the sort permitted by *Terry*." *Id.* at 373. The Court found that "they may, so long as the officers' search stays within the bounds marked by *Terry*." *Id.* The Court held that "[i]f a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons." *Id.* at 375.

In *United States v. Yamba*, the Third Circuit clarified the contours of the "plain feel" doctrine during a *Terry* search. 506 F.3d 251 (3d Cir. 2007). There, a police officer observed a parked truck that was blocking an entrance to a gas station and, as he got closer, observed the driver holding an open pocketknife and two passengers making "quick and furtive movements." *Id.* at 253. After an exchange of words, the officer ordered the occupants out of the car and conducted a pat-down of the passengers, including Yamba. *Id.* at 254. The officer testified that during his pat-down of Yamba

> along the right side, right coat pocket, I could feel a plastic bag. I noted through training and experience [that] narcotics are stored and transported in plastic baggies. After a brief second of just feeling it, I could tell that there was a soft

> spongy-like substance that is consistent with marijuana inside. I then recovered the bag from his pocket and found it contained suspected marijuana.

*Id.* The officer arrested Yamba for marijuana and later found additional incriminating evidence on his person. *Id.* After the evidentiary hearing, the district court found the officer to be credible and the evidence seized admissible. *Id.* Yamba was convicted and later appealed.

The Third Circuit reiterated the principles outlined in *Dickerson* and clarified, for evidence to be admissible under the plain feel doctrine, the *Terry* search must be for weapons, and the search must stay "within the bounds marked by *Terry*." *Id.* at 257 (quoting *Dickerson*, 508 U.S. at 373). The court went on, "[a] *Terry* search cannot purposely be used to discover contraband, but it is permissible that contraband be confiscated if spontaneously discovered during a properly executed *Terry* search." *Id.* at 259. The question[1] to ask is, if during the search, the police officer "had probable cause to believe an object was contraband *before* he knew it not to be a weapon and whether he acquired that knowledge in a manner consistent with a routine frisk." *Id.* at 259. In other words, courts must ask whether the police officer developed probable cause to believe, based on the officer's training and experience, that an object is contraband prior to dispelling a reasonable fear that the object is a weapon. *See id.*

Applying this standard, the Third Circuit asked whether the officer had probable cause to believe that the object in Yamba's pocket was contraband, and whether this occurred at the same moment or before he determined that Yamba had no gun on his person. *Id.* The court determined "[t]he record demonstrates that probable cause indeed existed before [the officer's]

---

[1] Around the time *Yamba* was decided, other courts were focusing on "exactly how 'immediately' an officer must know that something felt during a *Terry* search is contraband or precisely how much a clothed object can be manipulated before a search becomes illegal." *Id.* at 258. The Third Circuit rejected such a "narrow focus," emphasizing that the proper question under *Dickerson* is "what the officer believes the object is by the time he concludes that it is not a weapon." *Id.* at 259.

search went beyond the bounds of *Terry*" based on the officer's testimony at the evidentiary hearing. *Id.* at 260. The court noted that though the officer "admitted to manipulating the object even after forming the belief that it was not a weapon, he only did so to 'mak[e] sure it was what [he] knew it to be.' In other words, by that point [the officer] already had probable cause to conduct a more intrusive search than that authorized by *Terry* alone." *Id.*

## IV. Analysis

Collins argues that no protective pat-down occurred before the search of his inner pockets and submitted an affidavit attesting to the same. Collins argues Borges illegally searched his pockets without probable cause and without a warrant. (D.E. 39, Mtn. to Suppress at 7-8.) The government argues that Borges performed a protective pat-down, and he "immediately recognized the objects in Collins's pants as illicit narcotics" and "did not yet have the assurance that Collins's pockets did not contain a weapon." (D.E. 42, Gov't Opp. at 7.) This, the government argues, was an incidental discovery of narcotics during a routine protective pat-down as permitted by the plain feel doctrine's exception to the Fourth Amendment's warrant requirement. (*Id.* at 8.)

Initially, the Court notes that is clear from the Instagram live videos reviewed by the officers on the scene, including Borges, that the police were searching for two guns in a car occupied by three individuals freely swinging guns around during horseplay set to loud music. After finding one gun on Johnson, the officers focused on finding the other they were certain had to be there. (D.E. 42, BWC Footage at 14:51:55 to 14:52:37 (officer asking another passenger if he has a gun on him), *id.* 14:53:42 to 14:54:20 ("It's gotta be in there."), *id.* 14:55:02 to 14:55:22 ("Where's the other gun at?").) Based on that evidence, the Court finds that Borges initiated Collins's pat-down for a permissible reason—a search for weapons.

As to the search of Collins specifically, Borges testified that he "was looking for a weapon" and Collins's pockets were protruding out, so he could tell something was in them. (*Id.* 16:25-17:1, 34:19-35:8, 37:19-25, 39:14-18.) Borges's body-worn camera footage shows a brief outside pat of Collins's pockets before Borges pulls out the zip lock bags. (*Id.* 14:47:36 to 14:47:37.) Borges testified that although the angle of his body-worn camera was not the best, he patted-down "the outside [of Collins's shorts] with both hands at the same time." (*Id.* 17:1-20:1, 34:13-18.)

At the evidentiary hearing, frame by frame the body cam footage was shown and testified to. Albeit there were only seconds between when Borges started the pat-down and when he pulled drugs out of Collins's gym shorts, the Court sees no tension between what is seen on the video and what Borges said he was doing. He was searching for a gun, he saw the gap in Collins's shorts pockets (visible in Frame 00083 of the screen shots submitted by the government), he acted. The question becomes whether the drugs are admissible against Collins under the plain feel doctrine. For that to be the case, Borges must have developed probable cause to believe the objects he felt in Collins's pockets were contraband before he knew they were not weapons. *See Yamba*, 506 F.3d at 259-60. In other words, had Borges abandoned the thought that Collins might have the weapon before he located and seized the drugs. (Ironically, as it turned out, Collins *did* have the weapon and Borges missed it.)

Borges testified, "I felt the bag of the envelope and the rubber band," and that's when "I knew it was drugs," based on his experience as a police officer on the streets of Newark. (Borges Tr. 17:2-5, 19:7-12, 20:7-12, 48:12-19.) Borges testified that he is familiar with narcotics packaging and how that packaging typically feels, and that rubber bands are often used to keep envelopes containing drugs in place. (*Id.* 8:20-9:8, 38:7-10, 39:7-10, 48:20-49:4.) He

testified that after he felt the packaging and quantity of the objects, he knew they were drugs and pulled them out of Collins's pockets. (*Id.* 38:2-10, 39:22-40:6.) And the amount of drugs Borges found was significant—100 glassine envelopes of heroin and 41 jugs of crack cocaine. (*Id.* 52:5-16.)

Based on this testimony, the Court finds that Borges had probable cause to believe that the objects in Collins's pockets were illicit narcotics before concluding that his pockets did not contain any weapons. Borges's pat-down stayed within the bounds of *Terry* since at the point he recognized Collins had contraband in his pockets, Borges had not yet concluded Collins did not have the second gun on his person. The footage of the car search and police interaction with the occupants shows the effort all officers on the scene were putting into finding the weapons they were sure were in the car or on the individuals. Further, Collins was wearing clothes that support Borges's testimony. He had no shirt on. His baggy gym shorts made his pockets a natural place to stuff a gun, and Borges was patting down both pockets in that effort. Borges, an experienced street officer, came upon suspicious contents during the pat-down of the outside of Collins's gym shorts, and extracted what he had correctly identified by plain feel as packaged narcotics. The video shows that Borges discontinued his search of Collins's person at that point, overlooking the fact that the compression garment Collins wore under the gym shorts offered a secure hiding place for that second gun. Had Borges not made that mistake and continued patting Collins down and felt around his groin area, he – as another officer eventually did – would have discovered the gun from the outside, and Collins's argument here would have no validity.[2]

---

[2] Borges candidly admitted at the evidentiary hearing that he missed the gun in Collins's underwear, which he stated "was my mistake." (*Id.* 46:14-21.) Borges's candor on this point supports the credibility of his testimony as a whole. The long video recording of the officers' effort to locate that second gun shows police working competently – if frustratedly – to locate what they had every reason to believe was there. Narrowing down the search to Collins, they

The Court finds that the search of Collins's pockets was justified under *Terry* and the plain feel doctrine's exception to the Fourth Amendment's warrant requirement. The motion to suppress evidence seized from Collins is denied.[3]

## V. Conclusion

For the foregoing reasons, the Court denies Collins's motion to suppress. A separate order accompanies this opinion.

Dated: June 16, 2025

*/s/ Katharine S. Hayden*
Katharine S. Hayden, U.S.D.J.

found it. The record reveals a successful operation removing guns and drugs from the city, step by unglamorous step.

[3] Collins does not contest the validity of the second search of his person that uncovered the gun except insofar as it might constitute the fruit of the poisonous tree were the initial seizure illegal.